IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEREK KRAMER,**

        **Plaintiff,**

    v.

**AMERICAN ELECTRIC POWER
EXECUTIVE SEVERANCE PLAN, et al.**

        **Defendants.**

Civil Action 2:21-cv-5501
Judge Sarah D. Morrison
Magistrate Judge Jolson

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion to Compel (Doc. 35) and Motion for Extension of Time (Doc. 36). For the following reasons, the Motions are **DENIED**.

**I.    BACKGROUND**

Plaintiff is a former employee of Defendant American Electric Power Service Corporation ("AEP"). (Doc. 1, ¶ 1). AEP hired Plaintiff in 2018 to serve as the Chief Digital Officer of AEP Charge, which he claims was "a separate and independent business unit designed to promote innovation . . . ." (*Id.*, ¶ 7). In this role, he was offered an opportunity to participate in Defendant American Electric Power Executive Severance Plan ("the Plan"), which he accepted. (*Id.*, ¶ 15–16; Doc. 4, ¶ 15–16). Plaintiff was later terminated (Doc. 1, ¶ 22; Doc. 4, ¶ 22), and was denied severance benefits under the Plan (Doc. 1, ¶¶ 27–30; Doc. 4, ¶ 27–30).

The Employee Retirement Income Security Act of 1974 (ERISA) governs the Plan. (Doc. 1, ¶ 2; Doc. 4, ¶ 2). And, in particular, Plaintiff brings a claim for severance benefits under ERISA Section 502, 29 U.S.C. § 1132. (Doc. 1, ¶¶ 31–35). He also brings a claim for interference with protected rights under ERISA Section 510, 29 U.S.C. § 1140. (*Id.*, ¶¶ 36–43).

Previously, the Court allowed limited discovery beyond the administrative record—typically not permitted in ERISA actions—because Plaintiff had set forth facts suggesting the possibility of AEP's conflict of interest or bias in administering the Plan. (*See* Doc. 24). Defendants responded to Plaintiff's ensuing discovery requests and produced a privilege log for 340 documents withheld on the basis of attorney-client privilege and work product doctrine. (Doc. 35-1). Plaintiff challenged the claims of privilege for all documents created after October 19, 2020, the date on which Plaintiff's legal counsel first contacted AEP about his severance claim. (Doc. 35-2 at 2). Plaintiff argued that the fiduciary exception to attorney-client privilege under ERISA—which provides that a plan administrator must make any communications with counsel regarding administration of an ERISA plan available to a beneficiary upon request—prevented Defendants from claiming privilege against Plaintiff. (*Id.* at 1–3). Defendants disagreed, stating that the Plan belonged to the category of top-hat benefits plans exempted from several of ERISA's provisions, including the fiduciary exception to attorney-client privilege. (*Id.* at 4–5).

After further conferral (*see id.*), the parties were at an impasse regarding the claims of privilege, and Plaintiff brought the Motion to Compel (Doc. 35). Shortly thereafter, Plaintiff also brought a Motion for Extension of Time, asking the Court to extend the discovery deadline until sixty days after its ruling on the Motion to Compel, so that discovery could proceed in accordance with the Court's ruling—and so Plaintiff could potentially "seek to conduct a limited number of depositions based upon the documents available." (Doc. 36). Defendants opposed both motions, and they are fully briefed and ripe for review. (Docs. 37, 38, 39, 40).

**II.      STANDARD**

Two federal rules govern the Motion to Compel. Rule 26(b) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ.

2

P. 26(b)(1). Rule 37, for its part, allows for a motion to compel discovery when a party fails to answer interrogatories submitted under Rule 33 or to provide proper responses to requests for production of documents under Rule 34. *See* Fed. R. Civ. P. 37(a)(1), (3). "The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant." *Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citation omitted). "While relevancy is broad, 'district courts have discretion to limit the scope of discovery [when] the information sought is overly broad or would prove unduly burdensome to produce.'" *Plain Local Sch. Dist. Bd. of Educ. v. DeWine,* 335 F.R.D. 115, 119 (N.D. Ohio 2020) (alteration in original) (quoting *Surles ex rel. Johnson v. Greyhound, Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)). At base, "the scope of discovery is within the sound discretion of the trial court." *Stumph v. Spring View Physician Practices, LLC*, No. 3:19-CV-00053-LLK, 2020 WL 68587, at *2 (W.D. Ky. Jan. 7, 2020) (quotation marks and citations omitted).

Regarding the Motion for Extension of Time, Federal Rule of Civil Procedure 16(b)(4) provides that a court may modify a scheduling order for good cause. "[T]he touchstone of the good cause inquiry under Rule 16(b) is whether the moving party acted diligently in attempting to meet the deadline set forth in the pretrial order." *Permasteelisa CS Corp. v. Airolite Co.*, LLC, No. 2:06-cv-0569, 2007 WL 1683668, at *2 (S.D. Ohio June 8, 2007).

### III. DISCUSSION

The Court considers Plaintiffs' Motions separately.

#### A. Motion to Compel (Doc. 35)

The Motion to Compel turns on one question: Whether the Plan is a top-hat plan. A top-hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[.]" 29 U.S.C. § 1051(2); *see also Simpson v. Mead Corp.*, 187 F. App'x 481, 483 (6th

3

Cir. 2006); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 n.1 (6th Cir. 2007). Because top-hat plans are for a select few, they "are almost completely exempt for ERISA's substantive requirements." *Simpson*, 187 F. App'x at 483 (internal quotation marks omitted) (citing *In re New Valley Corp.*, 89 F.3d. 143, 148 (3d Cir. 1996)). For example, top-hat plans are exempt from: ERISA's minimum participation and vesting standards, 29 U.S.C. § 1051(2); its minimum funding standards, 29 U.S.C. § 1081(a)(3); and its fiduciary duties, 29 U.S.C. § 1101(a)(1). That last exception matters here because where there is a fiduciary duty, an exception to attorney-client privilege is triggered. Specifically, ERISA's fiduciary exception to the attorney-client privilege requires that "a fiduciary of an ERISA plan must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan." *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 595 (6th Cir. 2012) (internal quotation marks omitted) (citing *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787 (7th Cir. 2005)). This is so because "[w]hen an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries from whom the fiduciary acts, not the plan administrator." *Id.* (quoting *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992)). But where there are no fiduciary duties, attorney-client privilege stays intact. *See, e.g.*, *Cohn v. W. & S. Fin. Grp. Long Term Incentive and Retention Plan I*, No. 1:19-cv-943, 2021 WL 3662465, at *3 (noting that where plaintiff sought privileged documents but had conceded the plan was a top-hat plan, "the fiduciary exception to attorney-client privilege is not before the Court").

Here, Plaintiff argues that the Plan is not a top-hat plan so the fiduciary exception to attorney-client privilege applies. (*Id.* at 3–10). In support, he says the Plan is missing two elements of a top-hat plan. It serves more than a "select group" of employees, and it does not provide deferred compensation. (*Id.* at 5–9). Defendants, on the other hand, maintain that the Plan

4

provides deferred compensation to a highly selective group of employees and is thus properly categorized as a top-hat plan. (Doc. 37 at 5–12).

The Court considers each of Plaintiff's arguments against a finding that the Plan is a top-hat plan, regarding selectivity and deferred compensation, in turn.

*i. Selectivity*

In order to analyze the selectivity element of a plan, the Sixth Circuit has developed a four-factor test:

> In determining whether a plan qualifies as a top hat plan, we consider both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative).

*Bakri*, 473 F.3d at 678.

At the outset, the Court notes Plaintiff has made various arguments about how the Court's review of evidence related to this factor should be limited. Plaintiff says: (1) the administrative record does not contain sufficient evidence to establish that the Plan serves a select group; (2) the Court should not consider evidence outside the administrative record; and (3) it was necessary for Defendants to raise the top-hat issue at the administrative claim level. (Doc. 35 at 8–9). In particular, he says that the declaration from AEP's Director of Compensation and Executive Benefits (Doc. 37-4), submitted in conjunction with Defendants' response in opposition to this Motion, is "improper" (Doc. 39 at 6). In support of this proposition, Plaintiff relies upon *Daft v. Advest, Inc.*, 658 F.3d 583 (6th Cir. 2011).

Notably, *Daft* involved a district court's review of a plan administrator's conclusion that the disputed plan was a top-hat plan. *Id.* at 586. The plan administrator had erred in its legal analysis by applying only the final of the four *Bakri* factors. *Id.* at 595. The Sixth Circuit held

5

that the district court—having identified this misapplication of the law by the plan administrator— should have remanded to the plan administrator with legal instruction, rather than working through the complete *Bakri* analysis itself. *Id.* ("[W]here the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." (quoting *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2009))).

Here, no one is challenging the integrity of a plan administrator's decision—this issue was not raised at the administrative level. And Plaintiff cites no authority supporting his position that Defendants were required to have the plan administrator render a decision about the Plan's top-hat status at the administrative level. Nor has the Court found any such authority upon its own review. Indeed, there was no apparent reason to establish that the plan was a top-hat plan at the administrative level because that fact has only now become important in the context of the limited additional discovery Plaintiff has been permitted to take.

Tellingly, Plaintiff's plea for remand to the plan administrator is not full-throated. (Doc. 35 at 9 n.9) ("In this case, a remand to the plan administrator for further development of the record would be futile in light of the plain language of the plan discussed in [the portion of Plaintiff's brief discussing deferred compensation."). The Court agrees that remand on this issue is unnecessary. Unlike in *Daft*, this Court does not "lack[ ] crucial information relevant to the top-hat issue." 658 F.3d at 595–96. Admittedly, Defendants' declaration was not contained in the original administrative record, but having already expanded the scope of discovery beyond the administrative record for Plaintiff, the Court will not ignore Defendants' helpful supplementation now. To find otherwise would allow Plaintiff to wield the Court's prior ruling on discovery as both a sword and shield. And it would be inconsistent with the prior practices of this Court,

6

including those Plaintiff cites favorably. *See Deal v. Kegler Brown Hill & Ritter Co. L.P.A.*, 551 F. Supp. 2d 694, 700 (relying upon an affidavit from employer's director in consideration of *Bakri* factors).

Turning to the facts contained in the declaration, the selectivity of the plan is clear. Plaintiff seemingly acknowledges this, as he contests only the procedural propriety of the declaration, not its underlying facts supporting the selectivity of the plan. (Doc. 39 at 6–7). Based on the facts before the Court, the Plan meets each of the four elements of the *Bakri* test.

First, the Plan serves a very small percentage of the total workforce. In a company of over 17,000 employees, fifty-one were invited to join the Executive Severance Plan, and forty-six accepted this invitation. (Doc. 37-4, ¶ 2). This percentage, about 0.26% of the total workforce, easily meets the threshold for selectivity. *See Straney v. Gen. Motors Corp.*, No. CIV.A. 06-CV-12152, 2007 WL 3346149, at *8 (E.D. Mich. Nov. 8, 2007), opinion vacated in part on other grounds, No. CIV.A. 06-CV-12152, 2008 WL 162554 (E.D. Mich. Jan. 16, 2008) (4–5% of the workforce satisfied selectivity), *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000) (15% of the workforce was selective), *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1252 (D. Md. 1983) (membership, which fluctuated between 1.6 and 4.6% of the workforce, was selective).

Second, the nature of Plaintiff's duties reflects those of an elite group. The Sixth Circuit has offered "supervisory, policy making, or executive responsibility" as relevant indicators. *Bakri,* 473 F.3d at 680. By his own telling, Plaintiff had significant executive responsibility as he was hired as the chief officer for a new AEP business unit. (Doc. 1, ¶ 9).

Third, there is a significant compensation disparity between plan members and other employees. The average annual base compensation of a plan participant is over four times that of

a non-participant. (Doc. 37-4, ¶ 4). *See Cramer v. Appalachian Reg'l Healthcare*, Inc., No. CIV.A. 5:11-49-KKC, 2012 WL 5332471, at *5 (E.D. Ky. Oct. 29, 2012) (plan members made an average of 4.5 times that of non-members), *Callan v. Merrill Lynch & Co.*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *11 (S.D. Cal. Aug. 30, 2010) (plan members made, on average, twice that of non-members), *Vest v. The Nissan Supplemental Exec. Ret. Plan II*, No. 3:19-CV-1021, 2020 WL 7695261, at *6 (M.D. Tenn. Dec. 28, 2020) (court finding that even without exact figures, it was "readily inferable" that executive or management positions satisfied this element).

And fourth, the language of the Plan reflects its exclusive nature. Titled the "Executive Severance Plan," membership in the Plan is highly limited, and membership requires approval from the Human Resources Committee of the Board of Directors or the company's Chief Executive Officer. (Doc. 21-1 at 21, 24). In sum, the Plan is highly selective.

  ii.  *Deferred Compensation*

The parties dispute whether the Plan provides for deferred compensation. (Doc. 35 at 5–7; Doc. 37 at 5–6). This matters because a top-hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing *deferred compensation* for a select group of management or highly compensated employees[.]" 29 U.S.C. § 1051(2) (emphasis added). Plaintiff argues for a narrow interpretation of deferred compensation—one that would require participants to make affirmative deferral elections throughout their time of employment. (*Id.*). Conversely, Defendants argue for a broader reading of deferred compensation, defining it simply as compensation in the future for past work. (Doc. 37 at 5–6). Unsurprisingly, under the narrower definition, the Plan does not provide for deferred compensation; under the broader one, it does.

8

The Court turns to statutory language first. The various ERISA top-hat provisions do not define deferred compensation, nor is it defined in Title 29 of the U.S. Code, which contains statutes related to "Labor" generally. *See, e.g.*, 29 U.S.C. § 1051; 29 U.S.C. § 1081; 29 U.S.C. § 1101. Given this silence, Plaintiff argues that the Court should rely on Title 26 of the U.S. Code, which contains statutes related to the "Internal Revenue Code," for a definition. (Doc. 35 at 5–7). While true that courts have at times relied on ERISA-enacted provisions of Title 26 to shed light on provisions in Title 29, *see, e.g.*, *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004), here the application of those provisions is not quite so clear. Plaintiff points to 26 U.S.C. § 409A, which describes nonqualified deferred compensation plans. (Doc. 35 at 5). Broadly, that regulation holds that deferral elections made under a nonqualified deferred compensation plan must be made in accordance with certain timing provisions. 26 U.S.C. § 409A(4)(B). Plaintiff extrapolates this to mean that all deferred compensation must necessarily involve deferral elections. (Doc. 35 at 6). Yet, in light of relevant caselaw and directives from the Department of Labor, this gloss on deferred compensation is not compelling in the context of top-hat plans.

Deferred compensation is a rarely litigated component of the top-hat plan analysis. *Straney*, 2007 WL 3346149, at *6–7 (noting that "[v]ery few courts of appeal have had the occasion to address the meaning of *deferred compensation* in the context of a top-hat plan under ERISA."); *see also Demery*, 216 F.3d at 287 (determination centered on whether plan was unfunded and selective); *Deal*, 551 F. Supp. 2d at 700 (parties agreed that the plan was unfunded and for the purpose of providing deferred compensation, but disputed selectivity), *Cramer*, 2012 WL 5332471, at *2 (parties disputed the *Bakri* selectivity factors). And, significantly, the Sixth Circuit has not addressed the meaning of deferred compensation in the context of top-hat plans.

9

Other Circuits have not said much either. The Third Circuit defined deferred compensation with broad brushstrokes in *In re IT Group, Inc.*, 448 F.3d 661 (3d Cir. 2006):

> A deferred compensation plan "is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes." David J. Cartano, *Taxation of Compensation & Benefits* § 20.01, at 709 (2004). The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid. *Id.* at § 20.02[A], at 710.

*Id.* at 664. But in that case, the parties had not disputed whether the plan was maintained for providing deferred compensation. *Id.* at 667 ("[T]he only remaining question is whether the Plan was, in fact, 'unfunded.'"). Because the meaning of deferred compensation was not actually litigated, the utility of the Third Circuit's definition is limited.

The Ninth Circuit's decision in *Duggan v. Hobbs*, 99 F.3d 307, 309 (9th Cir. 1996), is more helpful. Duggan, a salesman who had an unresolvable disagreement about his commission structure with a director of his company, entered into a severance agreement in which he retired immediately in exchange for lifetime monthly retirement benefits. *Id.* When the company became insolvent nine years later and stopped paying benefits, Duggan brought suit under ERISA. *Id.* at 308–09. Though he prevailed on several claims, the district court found that the company's director, as plan administrator, was not personally liable to Duggan for breach of fiduciary obligations because the severance agreement was a top-hat plan. *Id.*

On appeal, the parties disputed whether the plan was deferred compensation and whether it was selective. *Id.* at 310. Duggan argued that the severance agreement was not deferred compensation because he had not made deferral elections prior to earning compensation and the agreement's benefits were not therefore the payment of "earnings" at a later date. *Id.* The director, on the other hand, "advocate[d] a more expansive view of deferred compensation[,]" to include "retirement payments where . . . the right to income derives from a severance agreement rather

10

than from past earnings that have been retained by the employer by prior arrangement for payment at a later date." *Id.* Faced with a choice between a narrow or expansive reading, the Ninth Circuit turned to the policy supporting the top-hat exception. Specifically, it noted that the Department of Labor has explained:

> [I]n providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protection of Title I.

*Id.* (citing U.S. Dep't of Labor, Office of Pension and Welfare Benefit Programs (E.R.I.S.A.), Opinion Letter No. 90-14A, 1990 WL 123933 (May 8, 1990)); *see also Bakri*, 473 F.3d at 678 (citing same opinion letter).

Said differently, it is the characteristics of the plan's beneficiaries—and not the precise contours of the deferred compensation scheme—that inform the choice to waive certain rights and protections otherwise guaranteed under ERISA. Top-hat plans were "excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." *Bakri*, 473 F.3d at 678 (quoting *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995)). For this reason, the Ninth Circuit concluded that "the policy behind the top-hat exception supports the broader view that 'deferred compensation' includes the retirement payments deriving from Duggan's severance Agreement." 99 F.3d at 311.

Here, the Court is similarly faced with two definitions of deferred compensation: Plaintiff's narrow one which would require beneficiaries of the Plan to have made deferral elections during the course of their employment, and Defendants' broader one which generally would encompass benefits conferred in the future for an employee's past work. The Court asks,

11

as did the Ninth Circuit in *Duggan*, which definition better aligns with the purpose of the top-hat exception. Simply put, whether the Plan requires participants to make deferral elections does not help distinguish the Plan as one covering employees "capable of protecting their own pension expectations[,]" from one covering those employees who cannot. Consider that the Department of Labor has taken the following position:

> the term "primarily", as used in the phrase "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" [in the coverage provisions] refers to the purpose of the plan (i.e., the benefits provided) and not the participant composition of the plan. Therefore, a plan which extends coverage beyond "a select group of management or highly compensated employees" would not constitute a "top hat" plan . . . .

U.S. Dep't of Labor, Office of Pension and Welfare Benefit Programs (E.R.I.S.A.), Opinion Letter No. 90-14A, 1990 WL 123933, at *1 n.1. In other words, a top-hat plan could primarily—that is, for the most part—provide deferred compensation, but it must exclusively serve a select group of management or highly compensated employees. *See* Peter J. Wiedenbeck, *ERISA's Curious Coverage*, 76 WASH. U. L. Q. 311, 343–44 (1998) ("[T]he Labor Department announced its view that 'primarily' refers to the benefits provided under the plan and not to the participant composition, so that the exemption may be lost if any participant is not a member of the 'select group.'"). As others have observed, this makes "[t]he key issue in determining whether a given arrangement qualifies as a 'top-hat' plan [ ] whether the covered individuals constitute 'a select group of management or highly compensated employees.'" Roger C. Siske, *Nonqualified Deferred Compensation*, 50 TUL. L. SCH. ANNUAL INST. ON FED. TAX'N § 18.2.3.1(A).

All this counsels in favor of giving a wider latitude to the meaning of deferred compensation. Because the Plan provides future compensation for past work, the Court finds that it primarily provides deferred compensation. Having already found that the Plan serves a select group of management or highly compensated employees, the Court further concludes that the Plan

12

is a top-hat plan. Accordingly, the fiduciary exception to attorney-client privilege does not apply, and Plaintiff's Motion to Compel (Doc. 35) is **DENIED**.

### B. Motion for Extension of Time (Doc. 36)

Discovery closed in this matter on February 14, 2023 (Doc. 33), shortly after Plaintiff brought his Motion to Compel (Doc. 35). Accordingly, Plaintiff also filed a Motion for Extension of Time (Doc. 36) to extend the discovery deadline. He says that the extension is necessary for two reasons: (1) if his Motion to Compel were granted, "a failure to extend the discovery deadlines in this case will have the effect of denying Plaintiff the benefit of the documents he seeks," and (2) "Plaintiff has not yet deposed any of Defendants' witnesses[,] [and] [a]s a matter of both strategy and economy, it makes little sense to conduct depositions until the universe of available documents is settled." (*Id.* at 5). The first of these reasons is moot, because the Court has denied Plaintiff's Motion to Compel.

Regarding the request to extend the deadline for depositions, Defendants say Plaintiff has not demonstrated good cause for the extension. (Doc. 38 at 2 n.1). The Court agrees. As the Court observed in its prior Order allowing limited discovery (Doc. 24 at 2), in ERISA actions, discovery beyond the administrative record typically is not permitted, *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998) (Gilman, J., concurring). This rule serves "[a] primary goal of ERISA . . . to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Perry v. Simplicity Eng'g. Div. of Lukens Gen. Indus.*, 900 F.2d 963, 967 (6th Cir. 1990) (citation omitted). Plaintiff was narrowly permitted to take discovery regarding AEP's conflict of interest or bias. (Doc. 24 at 6).

By the parties' mutual agreement, discovery was to be completed by December 16, 2022. (Docs. 25, 31). When Plaintiff brought an unopposed motion to extend that deadline by sixty days,

the reasons cited as supporting the extension were the volume of documents responsive to Plaintiff's requests for production and conferral over the privilege issues discussed above. (Doc. 32 at 2). Nowhere in that request did Plaintiff indicate his intention to take depositions. (*See* Doc. 32). The Court extended the discovery deadline until February 14, 2023, noting that "**No further extensions will be granted**." (Doc. 33). Defendants further represent that Plaintiff never requested discovery beyond the privileged documents, including depositions, in the time since the Court granted that final extension. (Doc. 38 at 2).

All told, the intention to take depositions was not presented to the Court—and does not appear to have been presented to Defendants—until the Motion for Extension of Time was brought, less than two weeks before the final extension of the discovery deadline. This does not demonstrate diligence, and reopening discovery at this time would thwart the "primary goal" that ERISA actions be resolved "inexpensively and expeditiously." *Perry*, 900 F.2d at 967. More still, reopening discovery would substantially prejudice Defendants, who have already filed a Motion for Summary Judgment (Doc. 41) under the existing case schedule. Accordingly, Plaintiff has not shown good cause, and the Motion for Extension of Time (Doc. 36) is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Compel (Doc. 35) and Motion for Extension of Time (Doc. 36) are **DENIED**.

IT IS SO ORDERED.


Date:  April 13, 2023                           /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE

14