UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEREK KRAMER,**

      **Plaintiff,**

  v.

**AMERICAN ELECTRIC POWER EXECUTIVE SEVERANCE PLAN,** *et al.*,

      **Defendants.**

:

:

:

Case No. 2:21-cv-5501
Judge Sarah D. Morrison
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

Derek Kramer brings this ERISA action against the American Electric Power Executive Severance Plan and its sponsor, American Electric Power Service Corporation, after a determination that Mr. Kramer was not entitled to benefits under the Plan. (*See* Compl., ECF No. 1.) The Administrative Record was filed (ECF No. 21-1), though Mr. Kramer was allowed limited additional discovery. The matter is now before the Court on Defendants' Motion for Summary Judgment. (Mot., ECF No. 41.) Mr. Kramer responded (Resp., ECF No. 52) and Defendants replied (Reply, ECF No. 53). Because AEP's conclusion that Mr. Kramer was terminated for Cause was neither arbitrary nor capricious, AEP's Motion for Summary Judgment is **GRANTED**.

### I.   BACKGROUND

AEP established and maintains the American Electric Power Executive Severance Plan ("Plan," appearing at ECF No. 21-1, PAGEID # 155–80) to provide

severance benefits to a select group of employees if their employment is involuntarily terminated. (*Id.,* § 1.1.)

In July 2018, AEP hired Mr. Kramer to be Vice President and Chief Digital Officer of AEP CHARGE, "a new AEP innovation hub." (ECF No. 21-1, PAGEID # 139.) AEP invited Mr. Kramer to participate in the Plan and, on April 3, 2019, he accepted. (*Id.*, PAGEID # 145.)

### A. Mr. Kramer was terminated after an internal investigation into his assistant's use of company credit cards.

Two weeks after becoming a participant in the Plan, Mr. Kramer had a call with Thomas Festi and Tom DeHaven from AEP's Audit Services Department ("ASD"). (*Id.*, PAGEID # 195.) During an annual proactive audit of company credit card use, ASD discovered that Martha Napalo (Mr. Kramer's Executive Assistant) had been charging personal expenses[1] to her company credit card—including "amazon purchases, meals for herself while out running errands for the department, supplies and snacks for the office, office hygiene and grooming items and gas for her personal vehicle." (*Id.*; *see also id.*, PAGEID # 205 ("[Ms. Napalo] had 66 personal expenses for $2,069.01 for the period 9/19/16 (her hire date) through 3/22/19.").) Messrs. Festi and DeHaven raised the issue directly with Mr. Kramer, "because Mr. Kramer, as Ms. Napalo's supervisor, has the responsibility to approve only appropriate charges and he is AEP's control over expenses for his subordinates."

---

[1] AEP's Corporate Credit Card Policy prohibits using the company credit card use "for personal or non-business purposes." (ECF No. 21-1, PAGEID # 280.) The Policy also provides that "[a]pproving supervisors are responsible for verifying the validity of" charges to a company credit card. (*Id.*)

2

(*Id.*, PAGEID # 195.) Mr. Kramer "indicated that he wanted to discuss the charges with" Ms. Napalo. (*Id.*) Later that day, Mr. Kramer emailed Mr. DeHaven:

> Thomas,
>
> Thanks for the insight.
>
> Connected with Martha this morning and covered off on the personal expense as a rare exception, timely submission, and mileage-over-gas reimbursement.
>
> Thank you again,

(*Id.*, PAGEID # 198.)

In ASD's audit the following year, however, "Ms. Napalo's name appeared as having the third highest number of charges on an AEP credit card. Her charges rivaled those of [AEP's] entire Fleet Services and Aviation organizations." (*Id.*, PAGEID # 195–96.) ASD investigated and found that $854 of expenses were personal in nature, but processed by Ms. Napalo and approved by Mr. Kramer as business-related. (*Id.*, PAGEID # 189.) Those charges included "Christmas and birthday gifts for [Mr. Kramer], flowers for [Mr. Kramer's] wife, flowers for [Ms. Napalo's] family, [and] a dress and bottles of personal fragrance for [Ms. Napalo]." (*Id.*)

On September 22, 2020, AEP's Ethics and Compliance department interviewed Mr. Kramer about the expenses. (*Id.*) His employment was then suspended for the remainder of the investigation. (*Id.*; *see also id.*, PAGEID # 185.) Per company policy, AEP Region Security Coordinator Kerrie Campbell went to Mr. Kramer's home after the interview to retrieve his company-issued cell phone. (*Id.*, PAGEID # 202.) Her Affidavit recounts the event:

3

> 5.      When I arrived at Mr. Kramer's home, and upon ringing the door bell, Mr. Kramer answered. I identified myself and advised Mr. Kramer that I was there to collect his phone for an ongoing investigation.
>
> 6.      Upon my asking Mr. Kramer for the phone, Mr. Kramer hesitated and asked if he could place a call first. As a courtesy, I agreed. At that time, he went back into the house and left me on his front porch.
>
> 7.      When Mr. Kramer returned, I again asked him for the cell phone. He held it in his hand and hesitated and said it was his phone and he used it for personal use. He then provided me with the phone and, pursuant to our protocol, I requested the PIN/security code for the phone. Mr. Kramer once again hesitated and then stated that if "I give you the Pin you will be able to see what I have on the phone" I looked at him and stated "yes they may need to look at the phone." Mr. Kramer told me the pin and I repeated it back to him. He advised it was correct. I wished him a good day and I returned to my vehicle.
>
> 8.      Upon returning to my vehicle, I wrote the Pin down he had given me, and started to pull away. I tested the PIN and learned that it was incomplete. I looked back towards Mr. Kramer's front door and saw him pacing outside, talking to himself in an animated manner.
>
> 9.      I pulled my car around through Mr. Kramer's circle driveway and got out of the car with the phone. I advised Mr. Kramer that I needed to confirm the PIN because I was not sure I had the complete PIN. Mr. Kramer then provided the complete PIN, which I confirmed unlocked the phone.

(*Id.*, PAGEID # 202–03 (reproduced as written).)

When the phone returned to AEP, it was sent for digital forensic examination. (*Id.*, PAGEID # 182.) AEP Security Manager Michael Knorps swore in an Affidavit:

> The phone was powered on and displayed the airplane mode symbol and the standard login password screen. The phone was unlocked using the passcode provided by Mr. Kramer. Password prompts were observed. This indicated a potential network connection and the Apple ID password having been changed prior to the phone being turned on, in addition to application passwords being changed remotely. The phone connected to an internal wireless network at AEP. The normal forensic extraction process was started but the device rebooted and began wiping

4

> itself clean. No other settings or operations were pressed on the phone. When the phone finished the rebooting process, it was fully wiped which indicated that a remote wipe had taken place.

(*Id.*)

On September 29, 2022, Mr. Kramer was asked why the phone wiped clean and restored to factory settings. He explained,

> in setting up his new phone, he removed his personal Apple ID and iCloud account from the old phone. Mr. Kramer did not do so with the intention of wiping the company phone or know that his actions had done so until it was brought to his attention during the September 29, 2020 call.

(*Id.*, PAGEID # 153.) But that explanation "did not appear to be possible." (*Id.*, PAGEID # 210.) Later research and testing confirmed that the fact scenario Mr. Kramer described "did not result in a wiped iPhone[.]" (*Id.*, PAGEID # 215.) Instead, AEP "concluded that the phone had been wiped remotely by Mr. Kramer." (*Id.*, PAGEID # 185.)

Three days later, on October 2, 2020, Mr. Kramer's employment was terminated. (*Id.*, PAGEID # 140.)

### B. The Plan provides severance benefits to participants who experience an Involuntary Termination—which does not include termination for Cause.

The Plan[2] provides severance benefits to participating AEP employees in the event that their employment "is terminated due to an Involuntary Termination or a Good Reason Resignation." (Plan, § 1.1.) An "Involuntary Termination" is a

---

[2] The only Plan document included in the record was amended and restated as of January 4, 2021. Neither party argues or alleges that the Plan's terms were different in any material or relevant way on the date of Mr. Kramer's employment termination.

5

"termination of employment initiated by [AEP] for any reason other than Cause."

(*Id.*, § 2.18.) A participant whose employment is terminated for Cause is not entitled to Plan benefits. (*Id.*, §§ 3.2(c)(4), 4.3.) "Cause" is defined to include:

> (ii) commission of an act of willful misconduct, fraud, embezzlement or dishonesty either in connection with the Employee's duties to any AEP System Company or which otherwise is injurious to the best interest or reputation of any AEP System Company; [and]
>
> (v) a material violation of any of the rules of conduct of behavior of any AEP System Company, such as may be provided in any employee handbook or as an AEP System Company may promulgate from time to time, following notice and a reasonable opportunity to cure (if such violation is capable of cure)[.]

(*Id.*, § 2.5.) The Plan provides that "[t]he Committee[3], in its sole and absolute discretion, shall determine Cause." (*Id.*)

### C. Mr. Kramer made a claim for Plan benefits. On receiving an adverse benefit determination, he appealed. The appeal was unsuccessful.

Mr. Kramer filed a claim for Plan benefits in November 2020. (ECF No. 21-1, PAGEID # 143.) The claim was denied in a January 19, 2021 letter from AEP Chief Human Resources Officer Julius Cox. (*Id.*, PAGEID # 145–47.) Mr. Cox determined that Mr. Kramer was "not entitled to executive severance benefits under the Plan because [his] termination was for 'Cause.'" (*Id.*, PAGEID # 145.) Mr. Cox cited both the corporate credit card misuse and the remote wiping of his company-issued cell phone as for-Cause reasons driving his termination. (*Id.*, PAGEID # 146.)

---

[3] The "Committee" is defined as "the Human Resources Committee of the Board of such other committee to which the Board has delegated the functions of its Human Resources Committee." (Plan, § 2.8.)

Mr. Kramer appealed Mr. Cox's decision to the AEP Executive Severance Plan Appeal Committee. (*Id.*, PAGEID # 149.) The Appeal Committee concluded that Mr. Kramer's employment was terminated for failure to supervise Ms. Napalo's company credit card use and for remotely wiping his company-issued cell phone during an internal investigation—and that those reasons constitute Cause. (*Id.*, PAGEID # 289–92.) This lawsuit followed.

## II. STANDARD OF REVIEW

ERISA benefit determinations are reviewed *de novo* unless the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Yaeger v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). If a plan grants discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger*, 88 F.3d at 380.

Though the parties agree that the Plan grants discretionary authority to both the Plan Administrator and the Committee, they dispute the applicable standard of judicial review.[4] Mr. Kramer argues that the Defendants are "judicially estopped

---

[4] They also dispute the proper form of Defendants' motion for judgment. Mr. Kramer asserts that the pending Motion for Summary Judgment is either technically improper or somehow distinct from the ordinary motion for judgment on the administrative record. (Resp., PAGEID # 584–86 (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998)).) Mr. Kramer puts up a paper tiger. The Administrative Record is before the Court. (ECF No. 21-1.) Mr. Kramer was allowed additional discovery, but attached nothing to his Response. The locus of the dispute is thus the Administrative Record. For avoidance of doubt, the Court hereby **CONSTRUES** Defendants' Motion for Summary Judgment as a motion for judgment on the Administrative Record.

7

from asserting a right to deferential review." (Resp., PAGEID # 586.) Earlier in the litigation, Defendants successfully argued that the Plan is a top hat plan exempt from ERISA's fiduciary provisions. (*See* ECF No. 49, PAGEID # 575.) In Mr. Kramer's view, the *Firestone* standard applies only to plans subject to those fiduciary provisions, and urges the Court to proceed with a *de novo* review. (Resp., 586–87.) But this Court has concluded that *Firestone* applies "even if" a plan is a top hat plan. *Whitescarver v. Sabin Robbins Paper Co.*, No. C-1-03-911, 2005 WL 8168487, at *4 (S.D. Ohio Apr. 28, 2005) (Dlott, J.).[5] The Court sees no reason to alter its prior conclusion.

"A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). Judicial review is no "rubber stamp"—rather the court examines the "quantity and quality of the . . . evidence on each side." *Id.* (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). "[T]hough the [arbitrary and capricious] standard is not without some teeth,

---

[5] Although *Whitescarver* was affirmed, the Sixth Circuit expressly declined to take up the question of whether "an ERISA top hat plan must be reviewed under a *de novo* standard." *Whitescarver v. Sabin Robbins Paper Co.*, 313 F. App'x 781, 787 (6th Cir. 2008). Of note, the same Plan language that gave the Court of Appeals comfort in applying an arbitrary and capricious standard in *Whitescarver* is also present here. *See id.* at 786–87 ("Where the Plan . . . describes the interpretation reached by the employer/administrator to be 'binding and conclusive,' we can only conclude that the plan meaning is to vest the type of discretion in the Plan Administrator that must be reviewed under an arbitrary and capricious standard."). (*See also* Plan §§ 7.1 and 7.3, PAGEID # 171.)

it is not all teeth." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1049, 1064 (6th Cir. 2014). "[I]ndications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker." *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp. 2d 868, 884 (S.D. Ohio 2013) (Rose, J.) (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)). However, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).

**III. ANALYSIS**

    **A.  Count One – Benefit Denial**

Mr. Kramer first asserts that he was improperly denied Plan benefits to which he was entitled. *See* 29 U.S.C. § 1132(a)(1)(B).  Mr. Cox and the Appeal Committee concluded that he was not entitled to those benefits because he was terminated for Cause. Mr. Kramer challenges the basis for those conclusions.

    **1.  The adverse benefit determination was not arbitrary or capricious.**

It is "a fundamental principle of ERISA law—the plain language of the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). Accordingly, the Court's "starting point is the language of the Plan itself." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011)

9

Under the Plan, "[e]ach Eligible Employee in the Plan who incurs an Involuntary Termination or Good Reason Resignation . . . and who satisfies the conditions of Section 3.2 shall be eligible to receive the Severance Benefits described in the Plan." (Plan, § 3.1.) Section 3.2 provides that "[a]n Eligible Employee shall not be eligible to receive Severance Benefits upon the Eligible Employee's . . . termination for Cause[.]" (*Id.*, § 3.2(c).)

Mr. Kramer's employment was terminated on October 2, 2020. (See ECF No. 21-1, PAGEID # 140.) Ms. Risch swore an Affidavit that she

> made the decision to terminate Mr. Kramer's employment. [She] had lost trust in Mr. Kramer as a leader of the CHARGE organization and as a Senior Officer of AEP. Mr. Kramer had been advised a year earlier that he had an employee whose commingling of company and personal credit card use was unacceptable and needed to be addressed. He was also either approving questionable expenses or not paying close enough attention to notice or question them. Mr. Kramer had a reasonable opportunity to cure these violations but he took no steps to correct the behavior. Mr. Kramer failed in his high duty as an Officer of the Company to manage and monitor corporate assets. When confronted with these concerns by investigators, he did not show accountability. Additionally, remotely wiping his Company cell phone was misconduct and an intentional and willful act of dishonesty.

(*Id.*, PAGEID # 186.)

On review of the claim, Mr. Cox concluded that Mr. Kramer's employment "was terminated for Cause for two reasons"—first, a material violation of the rules of conduct (failure to supervise Ms. Napalo's corporate credit card) and, second, willful dishonesty (remotely wiping his company-issued cell phone during an internal investigation). (*Id.*, PAGEID # 145–48.)

On review of the appeal, the Appeal Committee came to the same conclusion: Mr. Kramer's employment was terminated for two independent reasons constituting

10

Cause and he was, thus, ineligible for Plan benefits. (*Id.*, PAGEID # 289–92.) The Appeal Committee made additional, explicit findings as to Mr. Kramer's culpability for the conduct underlying his termination. As to the material violation of the rules of conduct, the Appeal Committee explained:

> Ms. Napalo used her card to purchase personal goods at your direction, including a dress for Ms. Napolo's personal use. It was your responsibility to review these purchases and ensure that they were appropriate, which you failed to do.

Further,

> [b]oth the 2019 [audit] report and the additional information provided in the affidavit of Thomas Festi . . . make it clear that you were notified that your conduct concerning business expenses, including the improper method for approving the expenses of others, was a material violation of the company's rules of conduct and that you were informed as such in 2019.

(*Id.*, PAGEID # 290.) And as to the willful dishonesty, the Appeal Committee found that the iPhone Research and Testing Report

> concludes that you or someone under your control or action must have intentionally erased the cell phone's contents remotely. In so doing, you attempted to deceive AEP about your company cell phone's contents during an ongoing investigation and lied about the actions you took to wipe the cell phone. Further, in the affidavit of Kerrie Campbell . . . , the record shows that you were not completely cooperative with the investigation but instead were resistant and dishonest in that process.

(*Id.*, PAGEID # 291.)

Mr. Cox and the Appeal Committee each offered a reasonable explanation, based on evidence, for their conclusion that Mr. Kramer was terminated for Cause. As such, the adverse benefit determination was neither arbitrary nor capricious. The Court will not disturb it.

### 2. Mr. Kramer's arguments otherwise fail.

Mr. Kramer offers a laundry list of reasons why the Court should set aside the determination. None have merit.

*Conflict of Interest.* Mr. Kramer first argues that "the Plan has a significant conflict of interest" because a large sum of money is at stake. (Resp., PAGEID # 589.) Under Sixth Circuit precedent, "conclusory allegations of bias based on th[e] (relatively common)" conflict of interest that exists when a single entity both decides and pays claims "do not deserve much weight." *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 418 (6th Cir. 2022) (internal quotations marks omitted). Instead, a plaintiff "should attempt to uncover evidence suggesting that the conflict materialized in a concrete way to influence the administrator's decisional process." *Id.* (citations omitted). Mr. Kramer offers no such evidence—despite having been allowed discovery outside the Administrative Record on his allegations of conflict. (*See* ECF No. 24, PAGEID # 308–09.)

*Written Explanation.* Mr. Kramer next argues that he was never given a written explanation for his termination. (Resp., PAGEID # 589.) But neither the Plan nor the law requires that an employer provide a contemporaneous written explanation on termination.

*Ex Post Facto Evidence.* Mr. Kramer further argues that "[a]ll of the 'for cause' evidence was generated after Kramer sought severance benefits." (*Id.*) The Court is unswayed by the insinuation that Mr. Cox's and the Appeal Committee's conclusions were based on *ex post facto* evidence. The conduct underlying the decision undeniably occurred before the termination. That it took another week for

the audit report to be finalized, or another month for Ms. Risch to complete an affidavit, is irrelevant.

*Attorney Engagement.* With no citation to authority, Mr. Kramer seeks a negative inference from Defendants' engagement of attorneys on this matter. (*Id.*, PAGEID # 590.) The Court draws none.

*Inconsistent Explanations.* In an August 29, 2023 declaration, Mr. Kramer states that AEP's reasons for his suspension and termination changed over time. (ECF No. 52-1.) The declaration was not subject to cross-examination, was not produced in discovery, and was not included in the Administrative Record. The Court thus declines to consider it. *Cf. Ace Am. Ins. Co. v. Gerling & Assocs., Inc.*, 630 F. Supp. 3d 919, 926 (S.D. Ohio 2022) (Marbley, J.) ("Self-serving affidavits alone . . . are not enough to create an issue of fact sufficient to survive summary judgment.").

*Termination Not For Cause.* Mr. Kramer disputes that the conduct alleged constituted "Cause" under the Plan. (*See, e.g., Resp.*, PAGEID # 591 ("The allegation the Kramer committed a material violation of the rules of conduct regarding his expense account does not support a determination that Kramer was terminated for cause.").) Mr. Kramer's multi-part challenge fails to show that the for-Cause determination was arbitrary or capricious.

Defendants' motion is **GRANTED** as to Count One.

**B.    Count Two – Interference**

In Count Two, Mr. Kramer alleges that AEP interfered with his ERISA-protected rights. *See* 29 U.S.C. § 1140. According to the Sixth Circuit, the

13

> emphasis of a § 1140 action is to prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan.

*Hogan v. Jacobson*, 823 F.3d 872, 885 (6th Cir. 2016) (internal quotations and citation omitted). But a plaintiff must "show more than the mere denial of a claim to establish that an [administrator] has acted with the intent of interfering with a future right under 29 U.S.C. § 1140." *Id.* (internal quotation and citation omitted). Mr. Kramer does not allege that AEP engaged in any conduct beyond denying his claim for Plan benefits.[6] The claim thus fails.

Defendants' motion is **GRANTED** as to Count Two.

## IV. CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment (ECF No. 41) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

---

[6] Mr. Kramer argues that AEP interfered with his right to benefits by "designat[ing] his discharge as 'for cause'." (Resp., PAGEID # 598.) That designation is part and parcel of the claim denial.

14